# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL CASE NO. 3:09CV164-MR-DSC

| | |
|---|---|
| GLORIA PACE KING, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> UNITED WAY OF CENTRAL ) <br> CAROLINAS, INC.; UNITED ) <br> WAY OF CENTRAL ) <br> CAROLINAS, INC. ) <br> SUPPLEMENTAL EXECUTIVE ) <br> RETIREMENT PLAN; PLAN ) <br> ADMINISTRATOR OF THE ) <br> UNITED WAY OF CENTRAL ) <br> CAROLINAS, INC. ) <br> SUPPLEMENTAL EXECUTIVE ) <br> RETIREMENT PLAN; EDWARD ) <br> L. CURRAN; GRAHAM W. ) <br> DENTON; CARLOS EVANS; ) <br> ANTHONY FOX; PAUL S. ) <br> FRANZ; and JEFFREY KANE, ) <br> ) <br> Defendants. ) <br> _____ ) | **MEMORANDUM AND RECOMMENDATION <br> AND ORDER** |

**THIS MATTER** is before the Court on the "Defendants' Motion to Dismiss" (document #24) filed June 5, 2009; and the parties' associated briefs and exhibits. (Documents ##25, 41, 43, and 46).

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and this Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that Defendants' Motion to Dismiss be granted   Further, the Court will grant Plaintiff leave to amend her Complaint to recast her First, Second, Fifteenth and

Sixteenth Causes of Action as claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Taking as true the factual allegations of the Complaint (which included the parties' "Employment Agreement" as an attachment), Plaintiff Gloria Pace King is a sixty-four year-old African-American woman, who became President of Defendant United Way of Central Carolinas, Inc. ("UWCC") in May 1994. The most recent Employment Agreement governing the terms of Plaintiff's employment with UWCC was executed December 17, 2007, and effective January 1, 2008. Under the terms of the Employment Agreement, Plaintiff was paid a base salary of $290,000 per year, was eligible for a discretionary bonus, retirement benefits, and other benefits. The Employment Agreement had a three-year term, unless earlier extended or terminated according to its provisions.

The Employment Agreement provided that UWCC could terminate Ms. King's employment "for cause" if a majority of the Executive Committee of the Board of Directors voted to do so and provided her with written notice. The Employment Agreement granted the Executive Committee "the sole discretion" to determine whether one of the six definitions of "cause" had been triggered. "Cause" is defined in the Employment Agreement as:

> 1      dishonest statements or acts of the Executive with respect to United Way, its affiliates or any of its member agencies, or acting in a manner that discredits or is detrimental to the reputation, character or standing of United Way, its affiliates or any of its member agencies;
>
> 2.     the conviction of Executive for a felony or any other crime involving moral turpitude, deceit, dishonesty or fraud;

3. a material breach by Executive of any of the covenants, terms or provisions of this Agreement, which breach has not been remedied within thirty (30) days after delivery to Executive by the Executive Committee of written notice of the facts constituting the breach;

4. willful failure by Executive to comply with reasonable instructions or directives from the Executive Committee;

5. substantial failure by Executive to perform Executive's duties and responsibilities reasonably assigned or delegated under this Agreement; and

6. gross negligence, willful misconduct or insubordination of Executive with respect to United Way or any affiliate of the United Way.

"Employment Agreement" at ¶ 4(b), Exhibit A to Complaint (document #10). In the event of a "for cause" termination, UWCC ceased to have any obligations under the Employment Agreement, meaning, among other things, that Plaintiff would not be entitled to any further compensation or benefits.

The Employment Agreement also provided that UWCC could terminate Ms. King "without cause" upon 30 days notice. In the event of termination without cause, UWCC agreed to pay Ms. King salary continuation benefits, based on the amount of her base salary – $290,000 per year – for the unexpired remainder of the term of the Employment Agreement "on a regular payroll period basis." However, this termination option required UWCC to conduct an ongoing review of Plaintiff's employment status post-termination because Plaintiff's right to receive these payments could be reduced or eliminated as follows:

if after a termination by United Way without Cause, Executive obtains new employment during the Employment Term at a base salary comparable to Executive's then existing Base Salary with United Way, United Way's obligation under paragraph 3(a) of this Agreement shall not exceed one year from the effective date of the termination without Cause by United Way.

Id. at ¶ 4©.

After completing her first year of employment, Plaintiff became eligible to participate in the UWCC's Defined Benefit Pension Plan ("Pension Plan") and Section 403(b) Plan ("403(b) Plan"), which are subject to Internal Revenue Service ("IRS") restrictions limiting the amount of benefits that could be paid to Plaintiff annually. In 1999, Plaintiff's salary and bonus exceeded the cap necessary to trigger the IRS restrictions, at which time she expressed concern to the Board about the adequacy of her pension. In 2000, she attempted to resolve the problem by implementing a Split-Dollar Insurance Plan, but to no avail.

Plaintiff then approached the Executive Committee of UWCC's Board of Directors with the idea of creating a supplemental executive retirement plan ("SERP") to remedy the decrease in her retirement savings caused by the IRS restrictions. The Compensation Committee discussed the idea of creating a SERP during a September 14, 2006 meeting attended by the following members of UWCC's Compensation Committee: Defendants Curran, Franz, and Denton, as well as non-parties Barbara Desoer and Gracie Coleman. Following a presentation by an outside consultant, the Compensation Committee recommended the creation of a SERP for Plaintiff. The Executive Committee, which included the five attendees of the meeting of the Compensation Committee, as well as six additional members of the Board/Executive Committee, approved the Compensation Committee's recommendation on the same day. Plaintiff entered into a SERP Agreement with UWCC in December 2006.

The UWCC's Form 990, that is, its disclosure to the IRS of Plaintiff's compensation for the taxable year July 1, 2006 through June 30, 2007, reflected Plaintiff's annual salary, other benefits, and a SERP contribution of $822,506.91, and included an attachment explaining that the SERP

payments were "larger than they would have been in order to achieve the ultimate intended benefit to the participant." The SERP contribution reported on the Form 990 was described as disproportionately large due to Ms. King's age, which was 61 at the time.

Shortly after the posting of the UWCC's Form 990, which made public the total amount of Ms. King's compensation, a local television station aired a story referring to Ms. King's combined salary and SERP contribution as a "one-time million dollar deal." This was the first of a barrage of "almost daily" news stories, articles and editorials criticizing Ms. King's compensation package and "making dire predictions about the impact the controversy would have on the success of the 2008 Annual Campaign." By way of example, the Complaint cites news articles with titles like <u>Controversy May Reduce Contributions</u> and <u>United Way Apologizes for Pay Gaffe</u>. The public perception that Plaintiff had engaged in some sort of wrongdoing in creating the SERP or setting her compensation was widely reflected in editorials and in blogs on the internet. Although most of the newspaper editorials were "circumspect," several blogs and postings by readers on the internet had "racial overtones."

Plaintiff further alleges that "[t]hough initially supportive, members of the Board eventually began to buckle under the media onslaught." Defendants Curran and Denton met with Plaintiff to discuss the public outcry and suggested that in order for Ms. King to continue her leadership, she would have to give up her SERP benefits. They also advised her to consult with an attorney and a financial advisor before the next Board meeting. Ms. King refused to give up her SERP benefits, and retained the law firm of James, McElroy and Diehl.

Plaintiff alleges that the Board concluded that the unrelenting public controversy surrounding her salary and retirement compensation impaired Plaintiff's ability to lead effectively. Defendants

5

Curran, Denton, Evans, Fox, Franz and Kane (collectively, the "Individual Defendants"), each of whom is a member of UWCC Board of Directors, recommended to the Board that Plaintiff be terminated. On August 25, 2008, counsel for UWCC advised Plaintiff's attorney, William K. Diehl, Jr., that Denton and Curran were attempting to contact her to deliver a letter advising her of the immediate termination of her employment, which Plaintiff allegedly never received.

On August 26, 2008, UWCC called a press conference in which Denton stated that, "[t]he ongoing controversy has impaired the ability of current leadership to perform effectively. As a result, the [UWCC] has decided to end Ms. King's employment and bring in new leadership." He also announced, "Mac Everett, whose name is synonymous with community service in Charlotte, will assume the title of interim president." Mac Everett is a white male, whom UWCC paid $20,000 per month as interim director.

On August 27, 2008, Curran and Denton sent Plaintiff a formal termination letter, in which they noted that her termination was without cause, though "[s]hould subsequent review of the Agency's records following your departure raise issues of "Cause" as defined under Section 4(b) of the Employment Agreement, we reserve the right to revisit the status of your departure."

On April 14, 2009, during a regularly scheduled meeting, the UWCC Board voted unanimously to terminate Ms. King with cause. Counsel for UWCC wrote a letter to Plaintiff explaining that the Board came to this decision after considering evidence that had by then come to light, indicating dishonesty and misconduct in her submission of travel, entertainment, and other expenses to UWCC. As a result, the Board directed that all salary-continuation payments under the Employment Agreement be discontinued.

As previously found by the District Judge to whom this case is assigned (the Honorable

Martin Reidinger), the procedural history of the case is as follows:

> The Plaintiff commenced this action on April 13, 2009 in the Mecklenburg County General Court of Justice, Superior Court Division, through the filing of an Application for an Order extending the time to file a complaint, pursuant to Rule 3 of the North Carolina Rules of Civil Procedure. [Doc. 1-2 at 2]. Along with the Application, the Plaintiff filed an Attachment, detailing the nature of the Plaintiff's anticipated claims for relief arising from the allegedly wrongful termination of her employment with [UWCC]. The Plaintiff indicates that she intends to file claims for racial discrimination, in violation of 42 U.S.C. § 1981; retaliation for exercising her rights under § 1981; breach of the provisions of the United Way of Central Carolinas, Inc. Supplemental Executive Retirement Plan ("SERP"), a plan governed by the federal Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"); wrongful termination, in violation of North Carolina public policy; unlawful withholding of wages, in violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq.; breach of the implied covenants of good faith and fair dealing; and defamation under North Carolina law. [Id. at 3-4]. This Attachment further indicates that, after exhausting administrative remedies, the Plaintiff intend[ed] to bring claims for relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and ERISA. [Doc. 1-2 at 3]. Also attached to the Application [wa]s the Plaintiff's Verified Motion for a Temporary Restraining Order and Preliminary Injunction. [Doc. 1-2 at 6].
>
> The Defendants received a copy of the Plaintiff's filings on April 15, 2009 and consented to service of process. [Doc. 1 at 2]. Thereafter, on April 17, 2009, the Defendants removed the action to this Court pursuant to 28 U.S.C. § 1446.

"Memorandum of Decision and Order" at 2-3, entered April 20, 2009 (document #4) (denying Plaintiff's Motion for Temporary Restraining Order).

On the same day that this matter was removed, Plaintiff sought relief from this Court on her Motion for a Temporary Restraining Order ("TRO"). Judge Reidinger conducted a telephonic hearing on Plaintiff's Motion that day. At the conclusion of the hearing, Judge Reidinger orally denied Plaintiff's Motion and on April 20, 2009 issued a "Memorandum of Decision and Order," quoted above, memorializing that denial. In the same Order, Judge Reidinger also ordered Plaintiff to file her Complaint by April 27, 2009, which she did.

7

The Complaint states 17 causes of action, ten of which are subject of the Defendants' Motion to Dismiss. Plaintiff alleges that the UWCC's action to cut off her salary continuation benefits supports, among other claims, four state law causes of action: (1) "Declaratory Judgment as to the Employment Agreement" (First Cause of Action); (2) "Breach of Contract/Anticipatory Repudiation of Contract" (Second Cause of Action); (3) "Breach of Duties of Good Faith and Fair Dealing" (Fifteenth Cause of Action); and (4) violation of the North Carolina Wage and Hour Act (Sixteenth Cause of Action). Plaintiff also alleges causes of action for race, gender and age discrimination and retaliation under 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act (the "ADEA") (Eighth through Thirteenth Causes of Action).

On June 5, 2009, Defendants filed their Motion to Dismiss, contending that the four state law claims discussed above are preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Additionally, Defendants maintain that applying the pleading standards enunciated by the United States Supreme Court in Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937 (May 18, 2009), Plaintiff's factual allegations fail to state claims under § 1981, Title VII, and the ADEA.

The Defendants' Motion has been fully briefed and is, therefore, ripe for disposition.

## II. DISCUSSION OF CLAIM

### A. ERISA Preemption

ERISA is a comprehensive statute enacted to establish a nationally uniform body of law regulating private employee benefit plans. See FMC Corporation v. Holliday, 498 U.S. 52, 58

8

(1990). Consequently, ERISA preempts all state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). A state law relates to such a plan and is preempted if "in the normal sense of the phrase … it has a connection with or reference to such a plan." Metropolitan Life. Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985). ERISA preemption is therefore broad and bars the assertion of state-law causes of action that "provide alternative enforcement mechanisms to ERISA's civil enforcement provisions." Darcangelo v. Verizon Communications, Inc., 292 F.3d 181, 190 (4th Cir. 2002).

The question presented by Defendants' Motion is whether the salary continuation provision of the parties' Employment Agreement amounted to an employee benefit plan within the meaning of ERISA. "When the factual circumstances are undisputed [or in this case, where the factual allegations are taken as true]… [the question of] whether the facts suffice to demonstrate the existence of a plan as defined by ERISA is a question of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

ERISA defines "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both." 29 U.S.C. § 1002(3). A "welfare benefit plan" is, inter alia, "any plan, fund or program … established by an employer … for the purpose of providing for its participants or beneficiaries … any benefit described in section 186(c) of this title." 29 U.S.C. § 1002(1). That section, in turn, includes "severance or similar benefits." 29 U.S.C. § 186(c).

However, although ERISA "contains a definition of employee benefit plan, this statutory definition provides scant guidance as to what constitutes a covered plan." Rinaldi v. CCX, Inc., 2008 WL 2622971, *3 (W.D.N.C. Jul. 2, 2008), quoting Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995). Accordingly, the Court must turn to the case law interpreting the statute

to determine whether an ERISA plan exists under the facts presented. Id.

The Supreme Court has noted that an employee benefit plan exists if the benefits provided "by nature require[] an ongoing administrative program to meet the employer's obligation." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987). Moreover, the Fourth Circuit Court of Appeals has held that an employee severance plan which requires an ongoing administrative program is an "employee welfare benefit plans within the scope of ERISA," even where the plan covered only one employee. Biggers v. Wittek Indus., Inc., 4 F.3d 291, 297 (4th Cir. 1993).

However, the Fourth Circuit has not specified what factors the Court should consider in deciding whether a particular severance plan requires an ongoing administrative program. Rinaldi, 2008 WL 2622971 at *3. As the parties agree in their briefs, District Courts in this Circuit have considered four factors suggested by other courts of appeal:

> (1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered by a single, unique event in the course of business or on a recurring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to the payments.

Mullaly v. Ins. Servs. Office, Inc., 395 F.Supp.2d 290, 295 (M.D.N.C. 2005). The first factor – how much discretion is required in determining eligibility for severance benefits – "is perhaps the most significant factor in deciding whether a contract … providing benefits requires an ongoing administrative scheme." Blair v. Young Phillips Corp., 158 F.Supp.2d 654, 659 (M.D.N.C. 2001).

Concerning the first factor, the District Court's recent ruling in Rinaldi concerning the severance benefits offered to a railroad's former President and CEO is instructive. In Rinaldi, the Honorable Robert J. Conrad, Jr. held that the employer's right to make a "for cause" determination prior to paying severance benefits involved sufficient managerial discretion to support ERISA

preemption. Rinaldi, 2008 WL 2622971 at *4. In the present case, the subject severance plan clearly involves managerial discretion not only because the Board was required to make a "for cause" determination, but also because for as long as the Board found no cause for her termination, it had the additional, ongoing discretion to eliminate or adjust the Plaintiff's benefit if she obtained a new position paying a "comparable" salary.

The other Mullaly factors also support preemption. Indeed, assuming an initial finding of "without cause," the Board would be required to regularly monitor Plaintiff's employment status, and if she became re-employed, to apply its discretion in determining whether her new salary was "comparable" to what she had been paid by UWCC. Similarly, under the terms of the Employment Agreement, Plaintiff was not entitled to a one-time lump sum payment, but rather to continue to receive her paycheck "on a regular payroll period basis." Finally, UWCC's obligation was "long-term," potentially lasting three years, and longer than the two-year period Judge Conrad found sufficient to support preemption in Rinaldi. 2008 WL 2622971 at *5-6.

Having found that the salary continuation program was an employee severance plan requiring an ongoing administrative program, Plaintiff's claims "related to" that plan are preempted by ERISA. Biggers, 4 F.3d at 297; and Rinaldi. 2008 WL 2622971 at *6-7 (state law breach of contract and N.C. Wage and Hour Act claims preempted). Accordingly, the undersigned will respectfully recommend that Defendants' Motion to Dismiss be granted as to Plaintiff's First, Second, Fifteenth, and Sixteenth Causes of Action. There being no dispute, however, that Plaintiff may have a claim for severance benefits under ERISA, the Court will grant her leave to amend her Complaint to recast the preempted claims as a claim or claims arising under ERISA. See Mullaly, 395 F.Supp.2d at 295 (granting leave to amend to recast preempted state law claims as ERISA

claim(s)).

## B. Discrimination Claims

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1960 (2009), quoting Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. 129 S. Ct. at 1951. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1951 (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true), citing Twombly, 550 U.S. at 554-55. Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing

12

more than conclusions." Id. at 1950.

Second, when there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 1951. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id., quoting Fed. R. Civ. P. 8(a)(2). In other words, if after taking the complaint's well-pleaded factual allegations as true, a lawful alternative explanation appears a "more likely" cause of the complained of behavior, the claim for relief is not plausible. Id. at 1951-52.

Applying these legal principles to the Plaintiff's discrimination and retaliation claims under § 1981, Title VII, and the ADEA, the Plaintiff has failed to state a plausible claim for relief. As the Defendants point out in their briefs, the lengthy Complaint contains numerous conclusory allegations of race, gender and age discrimination and retaliation, along with recitations of the elements of those claims. There is, however, very little by way of "well-pleaded factual allegations" supporting those conclusions or the underlying claims.

Plaintiff alleges "upon information and belief ... [that] the UWCC's decision [to terminate her] was made, at least in part, on the basis of the Board's perception of the discomfort of the Charlotte community with the idea of an African-American woman earning so much money." While the Complaint contains numerous examples of the community's discomfort with Plaintiff's compensation given UWCC's mission as a charity, the only related mentions of race in the

13

Complaint are blogs and other internet postings, and a single editorial in the Charlotte Observer, none of which are authored by or attributed to the UWCC, the individual Defendants, or any person affiliated with them. Accordingly, Plaintiff's assertion that UWCC's decision to terminate her was based on community discomfort with her race/gender and compensation is precisely the type of factually-unsupported, conclusory allegation that the Court must disregard. See Iqbal, 129 S. Ct. at 1951 (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true).

Although it is undisputed that the committee that recommended Plaintiff's termination was comprised of men, there is no factual support for Plaintiff's conclusory allegation that UWCC chose only men to serve on that committee with the intent that they would recommend termination based on Plaintiff's gender. Similarly, although it is undisputed that UWCC selected Mac Everett, a white male, to replace her on an interim basis, there are no well-pleaded factual allegations supporting Plaintiff's allegation that UWCC concluded that it was "more palatable for a white man to receive a generous salary than a black woman." The Complaint contains no other allegations, conclusory or otherwise, that UWCC hired Everett because of his race, gender, or age.

Concerning the later claim, the Plaintiff alleges in conclusory fashion that she was terminated on account of her age. The only allegation of fact in the Complaint related to Ms. King's age is that she was born February 27, 1945 and is 64 years old.

The Plaintiff's retaliation claims are likewise devoid of factual support. Although Plaintiff alleges that UWCC retaliated against her because she retained counsel, she also alleges that Defendants Curran and Denton advised her to consult with an attorney, and that she retained her present counsel thereafter.

Plaintiff alleges that UWCC retaliated against her for filing an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") by changing her termination status to "for cause." Taking the factual allegations of the Complaint as true, it is clear that UWCC was aware of and investigating reports of Plaintiff's alleged misconduct for months prior to the filing of her EEOC charge. Indeed, when UWCC terminated Plaintiff, the termination letter clearly stated that the "without cause" termination was subject to UWCC's right to revisit the status of her departure.

Plaintiff has not alleged any factual content that would "nudge" her claims of purposeful discrimination and retaliation "across the line from conceivable to plausible." Iqbal, 129 S.Ct. at 1952, quoting Twombly, 550 U.S. at 570. Instead, even having taken the Complaint's well-pleaded factual allegations as true, judicial experience and common sense dictate that it is more likely that UWCC terminated her employment because she could no longer lead UWCC effectively in the wake of the public reaction to the disclosure of her compensation and that UWCC chose Everett as her interim replacement because he is a respected local figure. See Iqbal at 1950. Accordingly, the undersigned will respectfully recommend that Defendants' Motion to Dismiss be granted as to Plaintiff's Eighth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Causes of Action.

### III. ORDER

**IT IS HEREBY ORDERED** that Plaintiff is **GRANTED** leave to amend her Complaint to recast her First, Second, Fifteenth and Sixteenth Causes of Action as a claim or claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS,** as well as the other reasons stated in the Defendants' "Brief in Support ..." (document #25) and "Reply Brief ..." (document #43), the undersigned respectfully recommends that the "Defendants' Motion to Dismiss" (document #24) be **GRANTED** and that Plaintiff's First, Second, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fifteenth and Sixteenth Causes of Action be **DISMISSED WITH PREJUDICE**.

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to counsel for the parties; and to the Honorable Martin Reidinger.

**SO ORDERED AND RECOMMENDED**.

Signed: August 6, 2009

David S. Cayer
United States Magistrate Judge